UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

CHRISTINE A. NEWMAN-WATERS, :
 :
  *Plaintiff*, :
v. : No. 1:04-cv-132
 : *Edgar*
BLUE CROSS/BLUE SHIELD OF :
TENNESSEE, INC., and BLUE CROSS :
AND BLUE SHIELD ASSOCIATION, :
 :
  *Defendants*. :

## MEMORANDUM

## I. Introduction

  Plaintiff, Christine A. Newman-Waters, ("Newman-Waters") originally brought this action in the Chancery Court of Hamilton County, Tennessee, [Doc. No. 1] against defendants, Blue Cross/Blue Shield of Tennessee, Inc, ("BCBST") and Blue Cross and Blue Shield Association ("Association") alleging: (1) improper denial of disability income benefits pursuant to 502(a)(1)(b) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. § 1132(a)(1)(B); (2) wrongful discharge in violation of ERISA, 29 U.S.C. § 1140; and (3) violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.* BCBST removed this action to this Court pursuant to 28 U.S.C. § 1441(b) on May 5, 2004.

  Following the filing of an Amended Complaint [Doc. No. 17] and an Answer [Doc. No. 18] thereto, the Association filed a motion to affirm the administrator's decision and for summary judgment on Newman-Waters' claim alleging improper denial of disability income benefits under ERISA. [Doc. No. 22]. Subsequently, Newman-Waters filed a motion for a judgment on the administrative record [Doc. No. 23], regarding her claim for improper denial of disability income benefits under ERISA.

In addition, Newman-Waters has filed a reply to the Association's motion to affirm the administrative decision and for a summary judgment [Doc. No. 26]. The Association has filed a response [Doc. No. 27], a reply [Doc. No. 28], and a surreply [Doc. No. 34] to Newman-Waters' motion for a judgment on the administrative record.

The Association has also filed a motion to strike Newman-Waters' affidavit – and the accompanying Audio Compact Discs ("CDs") [Doc. No. 31]. Newman-Waters has filed a response to the Association's motion to strike [Doc. No. 35] and the Association has file a reply to Newman-Waters' response to its motion to strike. [Doc. No. 36].

Consequently: (1) the Association's motion to affirm the administrative decision and for a summary judgment [Doc. No. 22], (2) Newman-Waters' motion for a judgment on the administrative record [Doc. No. 23] and the Association's motion to strike [Doc. No. 31] are now ripe for review. After a review of the record and pleadings, the Court concludes, for the reasons set forth in detail, *infra*, that: (1) the Association's motion to affirm the administrative decision [Doc. No. 22] will be **DENIED**, (2) the Association's motion for a summary judgment [Doc. No. 22] will be **GRANTED IN PART** and **DENIED IN PART**, (3) Newman-Waters' motion for a judgment on the administrative record will be **GRANTED** and (4) the Association's motion to strike [Doc. No. 31] will be **DENIED**.

II.    **Background**

Newman-Waters began working at BCBST on April 29, 1996. [Doc. No. 25, A.R. 204]. As part of her employment package, Newman-Waters was enrolled in BCBST's short-term disability ("STD") plan ("STD plan"). The STD plan provides for a maximum benefit period of 25 weeks; and, it also provides that no more than 25 weeks of STD benefits will be paid in a calendar year. A.R. 333. The STD plan states that

A disability exists when all three of the following conditions are met:

1.  you become continuously disabled by any non-occupational physical or mental illness or injury that prevents you from performing your regular or customary work;

2.  you are under the regular and continuous care of a licensed doctor, as defined herein, and following a prescribed course of treatment; and

3.  you are not working during the period of disability.

A.R. 328.

The STD plan further provides that:

To determine if Short-term Disability benefits will be paid, BCBST requires objective and acceptable medical proof that:

1.  you became disabled while a member of this Plan; and

2.  your disability has continued for a period longer than the benefit waiting period.

A.R. 330.

Further, the STD plan also provides in pertinent part that:

No benefits are payable if any of the following conditions are met:

3.  for any disability which is not supported by medical information from a medical doctor, surgeon, dentist, psychiatrist, nurse mid-wife or osteopath that contains a diagnosis and diagnostic code prescribed in the International Classification of Diseases or where no diagnosis has been obtained that includes a detailed Statement of Symptoms. Such medical information must also contain a Statement of Medical Facts including a secondary diagnosis, when applicable, within the physician's knowledge, based on physical examination and a documented medical history of the claimant by the physician indicating his or her opinion as to expected duration of the disability and a return to work date; . . . .

A.R. 331-332.

The STD Plan also provides that when filing a STD claim:

1.   You, as the disabled employee, telephone the National Employee Benefit Association (NEBA) . . . to report your claim within 48 hours of the disabling event.

2.   Contact your supervisor/manager to report your absence. (You must call every morning before 9am until your disability is approved.)

3.   When you first go to your doctor, ask him/her . . . to release medical information to NEBA.

4.   NEBA will then contact your Doctor to verify your disability claim.

**5.   You must file your claim no later than 15 days after the onset of your disability.**

6.   NEBA performs its review and notifies you and BCBST of the recommended period of time for which Short-term Disability benefits should be paid . . .

A.R. 329 (emphasis in original).

Finally, the STD Plan also provides that

If you disagree with the determination made on your claim for benefits, you have the right to request a thorough review of the decision. The procedure is as follows:

1.   Within 60 days after you receive written notice of the initial determination on your claim, you must file a written request for review. The review request should include any additional facts and documentation that will support your claim. For your assistance, you may ask for further explanation of the pertinent Plan provisions and the reason for the initial determination. . .

3.   After receipt of your written review request, NEBA will review and reconsider your claim. After this review, and within 60 days of your review request, NEBA will render a final written decision which will be mailed to you.

4.   BCBST has the exclusive right to construe and interpret the Plan and its provisions and to resolve all issues that may arise hereunder relating to: (a) the eligibility of employees to participate and/or to continue to participate in the Plan; (b) the amount of benefits to which any employee may become entitled hereunder; and (c) any situation not specifically covered by the provisions of the Plan as set forth herein. BCBST's decision on all matters with regard to the Plan shall be final and binding on all parties.

-4-

A.R. 333-34.

Newman-Waters stopped working on or about July 18, 2002, due to fibromyalgia.  A.R. 203-04.  At about that time, Newman-Waters submitted a claim for STD benefits under the BCBST STD Plan.  A.R. 201.   On August 12, 2002, the Association/National Employee Benefits Administration ("NEBA") sent Newman-Waters a letter informing her that her claim for STD benefits had been opened, but was still pending because her "medical provided has not responded to our requests for medical evidence." A.R. 194.   Thereafter on August 26, 2002, Newman-Waters received a letter from the Association stating in pertinent part that:

> Your Short Term Disability (STD) application was evaluated by the National Employee Benefits Administration ("NEBA"), a third-party disability consulting service contracted by Blue Cross and Blue Shield of Tennessee for benefits administration.
>
> NEBA has approved benefits from July 18, 2002, through September 4, 2002 . . . .

A.R. 175.  Subsequently, Newman-Waters received a letter from the Association informing her that NEBA has approved STD benefits "from September 5, 2002 through September 25, 2002.  A.R. 155.

On October 3, 2002, Newman-Waters received a letter from the Association informing her that her "application for Short Term Disability (STD) was evaluated by the Medical Review Committee (MRC) of . . .(NEBA), a third-party disability consulting service contracted by [BCBST] for benefits administration." A.R. 138.   The letter informed Newman-Waters that her STD benefits "are denied beyond September 25, 2002." *Id.*   The October 3, 2002 letter also stated:

**Reasons for the Denial of Your Claim**

Your claim is denied for the date(s) shown on page on because you are not eligible according to one or more provision of the STD Plan:

"Exclusions
No benefits are payable in any of the following conditions are met:

-5-

". . . for any disability which is not supported by medical information . . ."

A.R. 136 (emphasis in original). Newman-Waters appealed the October 3, 2002 denial of further STD benefits on December 12, 2002. A.R. 133-34.

Thereafter on January 16, 2003, Newman-Waters received a letter from the Association informing her that the Claims Appeal Committee (CAC) of NEBA had evaluated her appeal of the denial of STD benefits and had upheld the denial of STD benefits beyond September 25, 2002. A.R. 47. The letter also stated that:

> Your appeal of the denial of STD benefits is denied because you are not eligible according to one or more provisions of your Short Term Disability Policy:
>
> p.2. Definition of Disability ("A disability exists when all three of the following conditions are met:
> 1.     you become continuously disabled by any non-occupational physical or mental illness or injury that prevents you from performing your regular or customary work.)
>
> p.4, Proof of Disability ("To determine if Short-term Disability benefits will be paid, BCBST requires objective and acceptable medical proof that:
> 1.     your disability has continued . . ."
>
> p. 5, Exclusions ("No benefits are payable if any of the following conditions are met:
> 3. for any disability which is not supported by medical information from a doctor . . .
> 13. until NEBA has received objective medical evidence in support of your disability."

A.R. 48.

The letter also set forth the reasons for the affirmance of the denial of Newman-Waters' claim for STD benefits:

> The CAC reviewed all the available information submitted or obtained to support your claim. The CAC asked NEBA's consulting neurologist and specialist in pain management to review your claim. He commented as follows:
>
> •     You complain about seizures that your neurologist doesn't treat. Your EEG is normal.

- All of your studies are normal (MRI, blood, sed rate, EMG, EEG).
- Your statement that your muscles were in such spasm that they couldn't be tested by EMG is not confirmed by the report.
- The severe migraines that you reported were not mentioned again after July 2002.
  Fibromyalgia appears to be the newly emerged diagnosis.
- The Physical Therapy evaluation Sept. 16, 2002 notes symptom magnification.
- The medical records show only subjective pain complaints.
- You could work at the same time you went for physical therapy, that is not a reason to remain off work.
- Dr. Gordon does not indicate an impairment that prevents you from working.
- The records don't provide a reason you can't work.

The CAC noted the letter from Dr. Wilcox written on your behalf December 20, 2002. He wrote:

- you have "significant fibromyalgia;"
- Dr. Gordon treats you for seizures and migraines;
- he (Dr. Wilcox) prescribes pain medications, and referred you to pain management but they said they couldn't help you;
- he plans to refer you to a psychiatrist and rheumatologist.

But he did not provide opinion that you are disabled, did not describe any ways that you are limited or have difficulty functioning, did not explain why you could not return to work.

A.R. 48-49.[1]

Thereafter, on February 5, 2003, Newman-Waters wrote to BCBST requesting that her claim for STD benefits under the STD Plan be reopened and reconsidered in light of the additional information she had submitted. A.R. 22.

In a letter dated April 21, 2003, the Association informed Newman-Waters that the CAC of NEBA upheld the denial of her claim for STD benefits under the STD Plan beyond September 25, 2003. A.R. 3. The CAC upheld the denial of Newman-Waters' STD benefits:

. . . because you are not eligible according to one or more provisions of the Plan:

---

[1]     A duplicate of the January 16, 2003 letter also appears in the administrative record. A.R. 43-46.

p.2 Definition of Disability, you have an illness or injury that prevents you from performing your regular or customary work

p.4 Proof of Disability, you have objective and acceptable proof that your disability has continued

p5, 3 and 13: you are excluded if your disability is not supported by medical evidence from a doctor, or until NEBA receives objective medical evidence

A.R. 4.

The CAC stated that as the basis of its decision upholding the denial of STD benefits it found:

- Dr. Turners evaluation gives a diagnosis of fibromyalgia but does not comment on issues of disability, impairments or whether you are now, or were, unable to work.

- You were referred for psychiatric care to Dr. Gregory and apparently saw him Jan. 13 for an initial evaluation and again Jan. 28 on follow-up. He recommended you come back in three months. His evaluation Jan. 13, 2003 states you report sleep problems, poor appetite, weight loss. You want help for fibromyalgia. He described you as well nourished, in no apparent distress, with goal directed thoughts, a "not happy" mood, average intelligence, and memory intact. He says your psychosocial problems are severe but he does not say what they are, other than work problems. He assigns a GAF of 40 but does not describe major impairments. On the 28th he writes you are very upset over being fired for exhausting STD benefits. His notes are not entirely legible but apparently report you said you were more relaxed and stable overall until the above problems, now you can't sleep because you are so worried. Dr. Gregory signed a Medical Certificate for Unemployment on Feb. 20, 2003 and checked you left work for medical reasons Jan. 13 to Jan 24, 2003 but were able to return to work Jan. 24, 2003. These dates are not relevant to your status in September. Overall, his documentation does not demonstrate a disabling condition at any time . . . He wrote to your employer on Jan. 21 that you do not "seem able to function in the work place at this time." This is not sufficient to support disabling illness at the time it was written or retroactively to September 2002.

- Dr. Bolton, the gynecologist, writes a letter Jan 31, 2003 that you have fibromyalgia that has led to pelvic pain and bladder dysfunction. He does not address work related issues . . .

- A letter from Kirk Wilcox, MD, dated Jan. 23, 2003 and written at your request, states you have fibromyalgia, migraines and a seizure disorder. He writes you have been having severe pain and he prescribed Lortab for pain and Lexapro for depression . . . He did not comment on whether you are able to work either at the time of the letter or in September of 2002.

The CAC asked another physician (a board certified internal medicine specialist) . . to review your claim. He could find no evidence of disability. He commented that

the references by you and your doctor of the unfortunate episode where drug abuse was erroneously suggested and immediately corrected, seems like a smokescreen to distract from the fact there is simply no objective medical evidence to support a disabling medical condition. None of the treating physicians have explained why you could not perform your job duties.

. . . There was no evidence to support seizures or disabling migraines. A new diagnosis of fibromyalgia was made, but there was no evidence or physician opinion supporting disability. Physicians who described you diagnoses and the treatment fell short of saying they found you disabled or of describing symptoms. Significantly, a physical therapy evaluation concluded in three separate places, that the evaluator found signs of "symptom magnification."

The CAC concludes there is no evidence of disability beyond Sept. 25, 2002 . . . .

A.R. 4-5.

### III. Newman-Waters' Motion for a Judgment on the Administrative Record [Doc. No. 23]; The Association's Motion to Affirm the Administrative Decision and for a Summary Judgment [Doc. No. 22].

In her motion for a judgment on the administrative record [Doc. No. 23], Newman-Waters asserts that the Association's denial of her claim for STD benefits under the STD Plan was arbitrary and capricious. *Id.* at p. 9. Specifically, she asserts that the evidence in the administrative record clearly establishes that she suffers from fibromyalgia and that her fibromyalgia prevents her from performing her regular work. *Id.* She further asserts that the Association's decision affirming the denial of STD benefits as of September 25, 2002, misunderstood the nature of her illness (fibromyalgia) and ignored the evidence relevant to her ability to work. *Id.*

In its motion to affirm the administrator's decision and for a summary judgment [Doc. No. 22], the Association seeks, *inter alia*, a decision by this Court affirming its decision, as administrator of the STD Plan, denying STD benefits under the STD Plan to Newman-Waters as of September 25, 2002. The Association asserts that the decision denying STD benefits to Newman-Waters as of September 25, 2002 should be affirmed because it was not arbitrary and capricious. *Id.* at p. 2. Specifically, the

-9-

Association asserts that it, as administrator of the STD Plan considered all relevant evidence presented and made a rational decision to deny Newman-Waters' claim and appeals for benefits and, therefore, based upon the weight of the evidence, its denial of STD benefits should be affirmed. *Id.* at p. 18. The Association further asserts that Newman-Waters' claims were carefully reviewed throughout both the claims and appeals processes. *Id.* The Association also claims that in reviewing the record, "this Court would have to strain to find that the Association's decision was incorrect in any way, let alone that it was arbitrary and capricious." *Id.*

A.      **ERISA Standard of Review**

"An employee may challenge a benefit eligibility determination under 29 U.S.C. § 1132(a)(1)(B)." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). However, it is the employee's "burden to show that he was entitled to the 'benefits . . . under the terms of his plan.'" *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)(citing 29 U.S.C. § 1132(a)(1)(B).

It is a general principle of ERISA law that a plan administrator's denial of benefits is subject to *de novo* review, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003)(quoting *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989)). When the Plan documents give the plan administrator discretionary authority to determine benefits, the plan administrator's decision to deny benefits will be reviewed "under the 'highly deferential arbitrary and capricious standard of review.'" *McDonald*, 347 F.3d at 168-69 (quoting *Yeager*, 88 F.3d at 380).

As noted previously, the STD Plan documents state that "BCBST has the exclusive right to construe and interpret the Plan and its provisions to resolve all issues that may arise hereunder . . . BCBST's decision on all matters with regard to the Plan shall be final and binding on all parties." A.R. 333-34. Thus, the Court concludes that the Association's decision to terminate/deny STD benefits under the STD Plan to Newman-Waters as of September 25, 2002, is subject to the arbitrary and capricious standard of review because the Plan documents give BCBST/the Association discretion to interpret the terms of the Plan and determine eligibility for benefits under the Plan.[2]

The arbitrary and capricious standard of review is used "in order to avoid 'excessive judicial interference with plan administration.'" *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)(citing *Cook v. Pension Plan for Salaried Employees*, 801 F.2d 865, 870 (6th Cir. 1986)(quoting *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S. Ct. 105, 78 L.Ed.2d 108 (1983)). When using the arbitrary and capricious standard to review the denial of benefits under an ERISA plan, the Court is "required to consider only the facts known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 381 (citing *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)). Further,

> . . ."the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *see Firestone Tire Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989) . . . "is the least demanding form of judicial review of administrative action . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 422*, 64 F.3d 238, 241 (6th Cir.

---

[2] Further, the Court notes that in their respective motions seeking a judgment on the administrative record [Doc. No. 22, 23] both the Association and Newman-Waters are in agreement that the arbitrary and capricious standard applies to this Court's review of the Association's denial of Newman-Waters' claim for benefits under the STD Plan.

1995)(citations and internal quotation marks omitted). Thus, the standard requires that the decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Baker v. United Mine Workers of America, Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

*Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). "An ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are 'rational in light of the plan's provisions.'" *Yeager*, 88 F.3d at 381 (quoting *Miller*, 925 F.2d at 984 (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.), *cert. denied*, 488 U.S. 826, 109 S. Ct. 76, 102 L.Ed.2d 52 (1988)).

Finally, although the arbitrary and capricious standard is highly deferential, such deference "'need not be abject,'" and "'[d]eferential review is not no review.'" *McDonald*, 347 F.3d at 172 (citing *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)(quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)). Rather, review under the arbitrary and capricious standard

> . . . inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence – no matter how obscure or untrustworthy – to support a denial of a claim for ERISA benefits.

*Id.* (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003)).

**B.**     **Conflict of Interest**

In this instance, Newman-Waters argues that the Association is under a conflict of interest. Specifically, Newman-Waters notes that in her declaration, Barbara Grant states that the Association "licenses the use of the Blue Cross and Blue Shield service marks and provides other services to . . . Blue Cross and Blue Shield organizations throughout the United States." [Doc. No. 22-2, ¶ 3]. Further, according to Grant, through NEBA, the Association "administers both the short term and long term

-12-

disability programs for BCBST." *Id.* at ¶ 4.  In addition, as a condition for participating in the LTD Program, individual Blue Cross/Blue Shield employers contribute to the Disability Program Trust – which is the sole source of funding for the LTD Program. *Id.* at ¶ 9.  Finally, Grant states that the authority for the day-to-day operation of the disability Program has been delegated "to NEBA, a department of the Association." *Id.* at ¶ 12.

Thus, NEBA, a part of the Association, operates and administers the disability Program which is solely funded by the individual Blue Cross/Blue Shield organizations, such as BCBST, which are licensed by the Association.  Newman-Waters asserts that this establishes a conflict-of-interest on the part of the Association/NEBA with respect to disability benefits determinations and/or review of claims for disability benefits.

In *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998). Healthsource funded and administered the ERISA plan at issue.   The Sixth Circuit described the situation as a conflict of interest and stated that such conflict was a factor to be weighed in determining whether the plan administrator's decision was an abuse of discretion. *Id.* (citing *Bruch*, 489 U.S. at 109, 109 S. Ct. 948).

A conflict of interest, however, "if present does not 'alter the standard of review.'" *Wages v. Sandler O'Neill & Partners, L.P.*, 37 Fed. Appx. 108, 113, 2002 WL 339221, * 3 (6th Cir. 2002)(quoting *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998)).   The *Wages* court noted that a reviewing court should take a conflict of interest into account in determining whether a plan administrator's decision was arbitrary and capricious, but that such a factor should be applied "only where there is 'significant evidence' that the insurer was motivated by self-interest." *Id.* (quoting *Peruzzi*, 137 F.3d at 433).

-13-

While this Court notes that Newman-Waters is correct that the Association may have a potential conflict of interest, the Court finds that she has failed to adduce significant evidence that the Association/NEBA was motivated by self-interest in its decision to deny/terminate her STD benefits under the STD Plan. Thus, the Court finds that the Association's potential conflict of interest is not a factor which the Court is required to take into account in determining whether its decision to deny/terminate Newman-Waters' STD benefits was arbitrary and capricious. *Id.*

### C. Whether the denial of STD benefits to Newman-Waters was arbitrary and capricious.

As noted earlier, Newman-Waters contends that the Association's decision denying her STD benefits was arbitrary and capricious. The Association asserts the denial of STD benefits to Newman-Waters as of September 25, 2002, was not arbitrary and capricious.

The Association sent Newman-Waters a letter on August 12, 2002, indicating that NEBA, the third-party disability consulting service contracted by BCBST had received her application for STD benefits under the STD Plan. A.R. 194. The letter also indicated that although NEBA had opened the claim for STD benefits, it had not yet received either an application form or any medical evidence from Newman-Waters' medical provider. *Id.*

Thereafter, NEBA received an STD application form from Dr. Larry Gibson, one of Newman-Waters' treating physicians. In the application form, Dr. Gibson indicated his diagnosis of fibromyalgia/migraine – diagnostic codes 729.1/346.91. A.R. 191. He also indicated his date of initial evaluation of plaintiff as July 24, 2002, and indicated that she was continuously and totally unable to work from July 17, 2002. *Id.*

Attached to Dr. Gibson's application form is the report of his examination of Newman-Waters on July 24, 2002. A.R. 193. Dr. Gibson stated his diagnostic impression of Newman-Waters as

-14-

"[m]igraines and seizures, which apparently have escalated with associated pain syndrome." *Id.* Dr. Gibson also noted that he had not seen Newman-Waters since January 2002 and that she "has been given a diagnosis of fibromyalgia." *Id.* Ne noted that Newman-Waters had been experiencing "diffuse pain and muscle sensitivity" and that her weight had gone from 143 pounds to 119 pounds. *Id.* Dr. Gibson also observed that "[m]anipulation and palpation of any muscles induces pain." *Id.* Finally, as a result of his examination of Newman-Waters on July 24, 2002, Dr. Gibson described Newman-Waters as being in no acute distress and stated that she was ambulatory and was able to stand on her heels and toes. *Id.*

Dr. Gibson also saw Newman-Waters on July 30, 2002. He indicated that an MRI of the cervical spine, EEG and blood tests were normal. A.R. 192. He indicated that Newman-Waters continued to have generalized aches and pain and muscle tenderness to palpation. *Id.* Dr. Gibson diagnosed: 1. Fibromyalgia and 2. Migraines and seizures. *Id.*

Keri Todd, a therapist at BenchMark Physical Therapy performed an initial evaluation of Newman-Waters on July 23, 2002. Ms. Todd stated that Newman-Waters states she had difficulty sleeping and getting comfortable and that he back pain fluctuated from day to day from 2 - 9/10. A.R. 180. Ms. Todd also noted that Newman-Waters stated that she could not associate her pain fluctuations with any event, cycle or activity.

Ms. Todd's objective observations were that Newman-Waters had stiff and guarded movement, an antalgic gain pattern, slow movement, a forward head and rounded shoulders posture, a range of motion ("ROM") limited 50% on extension with pain and the low and mid-back, a ROM limited 50% on flexion with pain in the mid- and upper back, side bending limited 25% with pain on opposite sides. *Id.* Ms. Todd also noted that Newman-Waters reported

> tenderness in all typical Fibromyalgia tender points, including attachment of neck muscles at the base of the skull, midway between neck and should, along scapulas, lateral epicondyles, upper outer buttock, greater trochanters, just above knees medially, anterior lower neck and edge upper breast bone . . . .

*Id.* at 180-81.     Ms. Todd also noted that Newman-Waters presented with symptoms and signs consistent with the medical diagnosis. *Id.* at 181.

A progress note from BenchMark physical therapy dated September 6, 2002 and signed by physical therapist April Miller, noted that Newman-Waters "continued to have varying pain levels and limitations of all functional and recreational activities." A.R. 161.   The progress note also stated that multiple trigger points were noted on palpation. *Id.*

A progress note from BenchMark physical therapy dated August 19, 2002 and signed by April Miller, noted that Newman-Waters continued to have pain, soreness, and muscle tightness. A.R. 162. The progress note also stated that Newman-Waters had "extreme tenderness to palpation . . ." *Id.*   The progress note described Newman-Waters as "demonstrating good effort throughout . . ." and being "motivated and shows great initiative . . . ." *Id.*

A BenchMark progress note from August 9, 2002 completed by April Miller, states that Newman-Waters "continued to present with moderate to severe soreness and pain in multiple regions" and that she exhibited "extreme tenderness to palpation in all typical fibromyalgia tender points . . ." A.R. 164.   The progress note also states that Newman-Waters continued to experience increased pain and hypersensitivity to touch in the trunk region. *Id.*

Newman-Waters underwent an EMG on September 4, 2002. A.R. 153-54.   Dr. Gibson characterized the EMG as being a "[n]ormal study without evidence of neuropathy, myopathy, or radiculopathy." *Id.* at 154.

-16-

Newman-Waters underwent an initial evaluation by Charlie Jones on September 16, 2002. A.R. 140-41. Jones stated that Newman-Waters was alert and oriented and he noted some symptom magnification. A.R. 140. Jones also noted that "[p]alpation of tender points revealed 10 tender points present" and that "[t]rigger points were present in the stemocliedomastoid, scalene, cranial base, trapezius, infraspinatus, and rhomboids bilaterally." *Id.* Jones assessment was: (1) right lower back strain with posterior rotation dysfunction; (2) myofascial changes; (3) changes in posture with strain of the lumbar spine and associated trigger points of cervical spine; (4) weakness of scapular and core muscles of the back; (5) tight hamstrings, prirformis and plantar fascia; and (5) tempro-mandibular joint on right. A.R. 141. Jones also concluded that Newman-Waters "would benefit from physical therapy 3x / wk (three times per week) . . . ." *Id.*

The record also contains progress notes from RehabSouth. A.R. 110-130. Theses notes cover the period from October 3, 2002 through November 22, 2002. *Id.* Some of the notes are signed by April Miller, some are signed by Charlie Jones, and some are signed by both Jones and Miller. *Id.*

Dr. E. R. Blonsky reviewed the medical evidence in Newman-Waters administrative claims file on December 19, 2002. A.R. 59-60. Dr. Blonsky noted that although Dr. Gibson diagnosed seizures, he did not appear to be treating Newman-Waters for them. A.R. 59. He also noted that migraines are not mentioned in the medical record after July 2002. *Id.* Dr. Blonsky noted that the newly emerged diagnosis was fibromyalgia, but that the PT evaluation noted symptom magnification. *Id.* He also noted that if Newman-Waters "does not want to work she could resign." *Id.* at 59-60. Dr. Blonsky also noted that "[t]here are only subjective pain complaints which she uses to establish a disability status and for pain medication." *Id.* at 60. Finally, Dr. Blonsky notes that "a diagnosis is not a disability and Dr. Gibson does not indicate that the impairments that prohibit her from sedentary work." *Id.* at p. 60.

-17-

A letter from Dr. Kirk A Wilcox, dated December 20, 2002, appears in the record.  A.R. 58.

It states in pertinent part:

> I am writing this letter on behalf of my patient, Christine Waters.   She is a patient who is suffering from significant fibromyalgia. . . . I have been prescribing medications for her which include Lexapro, Naprosyn and Lortab.  I had referred her to pain management, but they said they couldn't help her.  I have therefore set up an appointment with a rheumatologist . . . and a psychiatrist . . .

*Id.*

A letter from Dr. Oliver L. Gregory, a board certified psychiatrist, dated January 21, 2003, appears in the record.   Dr. Gregory's letter states in pertinent part:

> [Newman-Waters] was seen January 13, 2003 to evaluate for treatment of depression, anxiety, and chronic pain syndrome associated with fibromyalgia.  Patient reports significant symptoms of pain and has problems with depression, irritability and insomnia and has no energy.   She does not seem able to function in the work place at this time.
>
> [Newman-Waters] is treated with Remeron, Gabitrel and Zaneflex . . . .

A.R. 37.

A letter from Dr. James P. Bolton, dated January 31, 2003, appears in the record.  A.R. 35.  The letter states in pertinent part:

> . . . I am a gynecologist and have been taking care of Ms. Waters for a number of years.  Ms. Waters has been diagnosed with fibromyalgia.  From my standpoint, this has led Ms. Waters to suffer with pelvic pain and a bladder dysfunction.  Ms. Waters is currently receiving treatment for her fibromyalgia by another physician, but I have recommended she also start with specialized physical therapy for her pelvic problems.

A.R. 35.

-18-

Progress notes from Dr. Oliver Gregory appear in the record. A.R. 27-29. Dr. Gregory's progress notes are handwritten and are mainly illegible. However, in his progress notes, Dr. Gregory assesses Newman-Waters' Global Assessment of Functioning (GAF) as 40.[3]

A medical certificate from Dr. Gregory, dated February 20, 2003, also appears in the record. A.R. 16. The medical certificate states that Newman-Waters was treated from January 13, 2003 to January 24, 2003, and that her condition was serious enough to necessitate her leaving her usual work. A.R. 16. The certified further states that Newman-Waters was released on January 24, 2003, and was able to work with no restrictions. *Id.*

Newman-Waters was examined by Dr. Elizabeth Turner, a rheumatologist, on February 6, 2003. A.R. 10-12. Dr. Turner noted that Newman-Waters was diagnosed with fibromyalgia in July 2002. *Id.* at 10. She noted that at first Newman-Waters had excessive somnolence, but that she eventually developed an inability to sleep, resulting in more irritability and increased pain. *Id.* She also noted that for the management of her fibromyalgia syndrome, Newman-Waters has been on Xanax, Zoloft, Ultram, Lortab 7.5, and Ketoprofen. *Id.*

Dr. Turner noted that Newman-Waters continues to have significant weakness and pain and has been unable to work eight hours day on a regular basis. *Id.* at 11. Dr. Turner noted that Newman-Waters sleeps six to seven hours per night, but does not feel well rested the next morning. *Id.* Dr.

---

[3] According to the *Diagnostic and Statistical Manual of Mental Disorders* (Fourth Edition, Text Revision) DSM-IV-TR, a GAF of 40 equated to:

> **Some impairment in reality testing or communication** (e.g. speech is at times illogical, obscure or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

DSM-IV-TR, p. 34.

Turner's assessment was fibromyalgia syndrome with persistent pain and non-restorative sleep. *Id.* at 12. Dr. Turner also noted that Newman-Waters was very compliant with an exercise program and is working with physical therapy on a regular basis. *Id.* Finally, Dr. Turner also noted that Newman-Waters had recently undergone a change in her medication regimen, which Dr. Turner hoped would improve Newman-Waters' symptoms over time. *Id.* Dr. Turner recommended that Newman-Waters continue with her current medications and also add a non-steroidal anti-inflammatory to her current regimen. *Id.* Further, Dr. Turner recommended that Newman-Waters continue with her medications, continue rehabilitation and return in three months, or sooner if necessary. *Id.*

As previously noted, Newman-Waters contends that the Association's denial of her claim for STD benefits is arbitrary and capricious because the Association misunderstood the nature of her disabling condition/impairment, fibromyalgia and, in light of this misunderstanding, the Association failed to even consider her subjective complaints. [Doc. No. 23, pp. 16-19]. Further, she also asserts that the Association's/Dr. Blonsky's reliance on the lone Rehab South evaluation in which the physical therapist suggested symptom magnification was arbitrary and capricious. *Id.*, pp. 20-21.

Several courts have discussed the unique problems presented by fibromyalgia in making an assessment of disability. In *Conrad v. Continental Cas. Co.*, 232 F. Supp.2d 600 (E.D. N.C. 2002), the court stated:

> Fibromyalgia is a musculoskeltal disorder which causes severe pain in the muscles, ligaments and tendons. According to the American College of Rheumatology, a patient may be diagnosed with this disease if [she] has a history of widespread pain as well as pain in 11 of 18 tender point sites located throughout the body. *See* F. Wolfe, et al.*, The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, 33 Arthritis & Rheumatism 160-72 (1990). Patients which suffer from this disorder may also experience fatigue, irritable bowel syndrome, sleep disorder, chronic headaches, jaw pain, memory impairments, skin and chemical sensitivities, was well as dizziness and lightheadedness . . .

. . . this particular disease though recognized by the medical community as real and potentially disabling, is primarily diagnosed by a physician. Thus, its existence or non-existence is verifiable. However, its severity and ultimate effect is primarily based upon the patient's subjective self-reporting. Thus, the question of whether the disease has caused the plaintiff to be disabled remains diffuse.

*Id.* at 603-04.

Further, in *Welch v. Unum Life Ins. Co. of America*, 382 F.3d 1078 (10th Cir. 2004), the Tenth

Circuit stated of fibromyalgia:

"Because proving the disease is difficult . . ., fibromyalgia presents a conundrum for insurers and courts evaluating disability claims." *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999). *Compare id.* (holding that "no objective test exists" for proving fibromyalgia); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004)("[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)("[A] growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'")(quoting *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)(noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . ., but the amount of pain and fatigue that a particular case of it produces cannot be") *and McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000)(holding that fibromyalgia's "cause is unknown, there is no cure, and the symptoms are entirely subjective"); with *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003)("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003)(noting that Social Security claimant's testimony and reports to the Social Security Administration were "supported by objective medical evidence of fibromyalgia"); and *Russel v. UNUM Life Ins. Co. of Am.*, 40 F. Supp.2d 747, 751 (D.S.C. 1999)(considering a nearly identical self-reported symptoms limitations and holding that fibromyalgia is an objectively diagnosable condition).

*Id.* at 1087.

Newman-Waters contends the denial of her claim for STD benefits by the Association/NEBA

was arbitrary and capricious because: (1) the fact that she suffers from fibromyalgia is established by the

medical evidence in the administrative record; (2) the Association/NEBA demonstrated a lack of understanding of the nature of fibromyalgia in the course of the review of her claim for STD benefits; (3) the Association/NEBA failed to give any consideration to her *subjective* statements concerning the effects of her fibromyalgia on her ability to work; (4) the Association/NEBA focused solely on and over-emphasized the statements in Charlie Jones' initial evaluation concerning her alleged "symptom magnification"; and (5) the statement by the independent medical reviewer, Dr. Blonsky, that "if [Newman-Waters] does not want to work she could resign," A.R. 59-60, reveals that he was biased and lacked objectivity about her fibromyalgia and that his opinion/assessment should have been accorded little, if any, weight in determining whether she was entitle to STD benefits.

In this instance, Newman-Waters has presented evidence that she suffered from fibromyalgia. First, her treating physician, Dr. Gibson, diagnosed fibromyalgia. A.R. 192. During her initial evaluation of Newman-Waters on July 23, 2002, for BenchMark physical therapy, Keri Todd found tenderness in all typical fibromyalgia tender points and stated that Newman-Waters presented with symptoms and signs consistent with the diagnosis of fibromyalgia. A.R. 180-81. On September 6, 2002, April Miller, another BenchMark physical therapist, found multiple trigger points, varying pain levels, and limitations of all functional and recreational activities. A.R. 161. On August 9, 2002, April Miller found that Newman-Waters exhibited "extreme tenderness to palpation in all typical fibromyalgia tender points." A.R. 164. Even Charlie Jones, in his September 16, 2002, evaluation for RehabSouth found ten (10) tender points present on palpation. A.R. 140. Another of Newman-Waters' treating physicians, Dr. Kirk Wilcox, stated that Newman-Waters was suffering from significant fibromyalgia, he prescribed Lexapro, Naprosyn and Lortab and referred Newman-Waters to, *inter alia*, a rheumatologist. A.R. 58. Dr. James P. Bolton, Newman-Waters' treating gynecologist, stated that Newman-Waters' had fibromyalgia which resulted in pelvic pain and bladder dysfunction. A.R. 35. Dr. Bolton recommended

that Newman-Waters take specialized physical therapy for her pelvic problems. *Id.* Finally, Dr. Elizabeth Turner, a rheumatologist, examined Newman-Waters on February 6, 2003, she noted that Newman-Waters was taking Xanax, Zoloft, Ultram, Lortab 7.5 and Ketoprofen for her fibromyalgia syndrome. A.R. 10. She noted that Newman-Waters had significant weakness, pain, and had been unable to work eight hours per day on a regular basis. A.R. 11. Dr. Turner diagnosed fibromyalgia syndrome with non-restorative sleep. A.R. 12. She recommended that Newman-Waters add a non-steroidal anti-inflammatory to her medical regimen and stated that she "hoped" that Newman-Waters' symptoms would improve over time. *Id.*

Accordingly, the Court finds that the record contains considerable evidence Newman-Waters suffers from fibromyalgia.

Moreover, Newman-Waters also claims that the Association's/NEBA's denial of STD benefits was arbitrary and capricious because they demonstrated a lack of understanding of the nature of fibromyalgia in the course of their review of her claim for STD benefits. Essentially, Newman-Waters asserts that the Association/NEBA focused on the alleged lack of objective evidence supporting her claim of disability due to fibromyalgia, but ignored the inherent nature of fibromyalgia; namely, that it is a disease for which no objective test exists. See *Welch*, 382 F.3d at 1087.

The Court agrees, First, it is apparent that NEBA, especially its reviewer Dr. Blonsky, treated both the diagnosis of fibromyalgia and Newman-Waters' subjective claims of disability due to fibromyalgia with a considerable degree of skepticism. In its January 16, 2003 letter upholding the denial of her claim for STD benefits, the Association noted that the reviewer, Dr. Gordon, commented that Newman-Waters' objective tests – MRI, blood, sed rate, EMG and EEG were normal. A.R. 48-49. The letter also stated that the review commented that "[f]ibromyalgia *appears* to be the newly emerged diagnosis." *Id.* (emphasis added). Further, the letter noted: (1) that the "Physical Therapy evaluation

-23-

Sept. 16, 2002 notes symptom magnification" and (2) Newman-Waters' "medical records show only subjective pain complaints." *Id.* Finally, the letter also notes that Dr. Gordon commented that Newman-Waters "could work at the same time you went for physical therapy, that is not a reason to remain off work." *Id.*

Most importantly, the January 16, 2003, letter states that Newman-Waters was not entitled to STD benefits: (1) "for any disability which is not supported by medical information from a doctor"; and (2) "until NEBA has received objective medical evidence in support of your disability." However, it is just this such of objective evidence of fibromyalgia and disability due to fibromyalgia which Newman-Waters could not produce due the nature of her illness. *Welch*, 382 F.3d at 1087; *Conrad*, 232 F. Supp. at 603-04.

Further, Newman-Waters claims that the Association/NEBA focused on and over-emphasized the statement in Charlie Jones initial evaluation concerning Newman-Waters' alleged "symptom magnification." The Court agrees. Charlie Jones did state that he found symptom magnification, A.R. 140; however, Jones did not suggest that Newman-Waters was asymptomatic. First, although he did state that he found symptom magnification, Jones also stated that Newman-Waters would benefit from physical therapy three times per week. A.R. 141. Further, Jones listed, *inter alia*, as short range goals of Newman-Waters' physical therapy: "(1) Sleep 5 consecutive hours; (2) Pain will decrease 10% overall; and (3) Tolerate 10 to 15 min[utes] of stretching and flexibility exercises. . . ." *Id.* Further, Jones also listed, *inter alia*, as long range goals of Newman-Waters' physical therapy: (1) Awaken rested 5 out of 7 days; (2) Pain will decrease 25% to 35%; and (3) Tolerate 30 to 45 minutes of stretches, low impact aerobic exercises . . . ." *Id.* Thus, contrary to the Association's/NEBA's conclusions in its letter of January 16, 2003, Jones initial evaluation, despite Jones' suggestion of symptom magnification, supports rather than contradicts Newman-Waters' claim.

-24-

Moreover, the association mentions only Jones' initial evaluation. However, the record contains other reports of physical therapy. For instance, RehabSouth daily progress notes for November 20, 2002, state that Newman-Waters is continuing to have difficulty with pain and sleep pattern, and is limited in various activities of daily living due to her pain pattern. A.R. 85. On November 14, 2002, Newman-Waters reported she was having more restful sleep, but only for short periods of time. A.R. 87. On November 13, 2002, physical therapist April Miller reported that although Newman-Waters was showing good effort in her physical therapy regimen, she continued to be limited with all functional and recreational activities due to varying pain and emotional levels. On November 6, 2002, April Miller reported that Newman-Waters was having varying pain levels which limited her ability to complete certain exercises. A.R. 92. On October 30, 2002, April Miller reported that Newman-Waters had completed all exercises and demonstrated good effort, but she noted that Newman-Waters had pain and tenderness in multiple regions and multiple trigger point areas. A.R. 94. She also commented that Newman-Waters would need frequent motivation and reminders that her current condition would take time to improve. *Id.* On October 23, 2002, April Miller reported that plaintiff was continuing to respond well and was exhibiting increasing mobility and tolerance with activities. A.R. 96. She also noted that Newman-Waters was "[s]lowly regaining the ability to perform various activities independently, such as going to the grocery store." *Id.* Miller did note, however, that Newman-Waters was having varying pain levels and difficulty with sleep patterns. *Id.* In addition, on October 18, 2002, April Miller reported that Newman-Waters was responding well to her current physical therapy plan and was exhibiting overall improvement with flexibility and pain levels. A.R. 98. She also commented that Newman-Waters was demonstrating increasing tolerance to all activities. *Id.* But she also commented that Newman-Waters needed reminding not to overdo it and go beyond her body's limits, particularly on her good days. *Id.* Likewise, on October 9, 2002, April Miller reported that Newman-Waters was

-25-

exercising with good effort, but was experiencing pain in all regions. A.R. 102. Miller also reported that Newman-Waters was extremely emotional and frustrated with the slow progression of her current condition. *Id.* In a RehabSouth progress note dated October 4, 2002, Miller reported that Newman-Waters was having difficulty sleeping and performing all activities of daily living. A.R. 104. She also stated that Newman-Waters was having emotional days due to increased pain and soreness. *Id.* Finally, on October 3, 2002, Miller reported that Newman-Waters was performing all her exercises at a slow and guarded pace. A.R. 105. Miller reported increased pain throughout the entire session and stated that Newman-Waters was having difficulty with sleeping. *Id.* She also reported that Newman-Waters was experiencing up and down emotional phases due to a decreased ability with all functional and recreational activities. A.R. 105.

Thus, the record contains numerous physical therapy progress notes which contradict Charlie Jones statement about symptom magnification. Moreover, the fact that Jones, despite his "alleged" finding of symptom magnification, recommended a fairly extensive course of physical therapy – three times per week – also undercuts the credibility the alleged symptom magnification. There is no indication, in the letters from the Association/NEBA which denied Newman-Waters' claims for STD benefits, that any of these reports were considered. Instead, they focused almost exclusively on Jones' statement about symptom magnification.

Moreover, the other physical therapy progress notes document Newman-Waters' subjective complaints about her medical condition. In particular, the notes record Newman-Waters' statements about the impact her fibromyalgia was having on her level of pain, her difficulty sleeping, and her ability to function – including her ability to engage in activities of daily living. As Newman-Waters correctly notes, there is no indication that the Association/NEBA gave any consideration to these reports beyond noting that Newman-Waters was trying to document her disability with mainly subjective evidence.

Finally, Newman-Waters asserts that the statement by the independent medical reviewer, Dr. Blonsky, that "if [Newman-Waters] does not want to work she could resign," A.R. 59-60, reveals a lack of objectivity about her condition and that his opinion/assessment should have been accorded little, if any, weight. The Court agrees that Dr. Blonsky's statement clearly undercuts the credibility of his opinion/assessment.

The Court recognizes "that a diagnoses of fibromyalgia does not equate to a finding of disability." *Conrad*, 232 F. Supp. 2d at 604. However, in this case, the Association/NEBA focused on what, given the nature of fibromyalgia, Newman-Waters could not provide, objective evidence documenting her fibromyalgia and confirming the severity of her symptoms. However, the record does contain evidence – particularly, the diagnosis of her doctors, the reports/evaluations of her physical therapists, the number and nature of the medicines prescribed to treat the symptoms of her fibromyalgia, and the fact that Newman-Waters engaged in a fairly prolonged course of physical therapy – which objectively support Newman-Waters subjective complaints about the severity of the symptoms cause by her fibromyalgia.

The administrative record shows that in denying Newman-Waters' claim for STD benefits as of September 25, 2002, the Association/NEBA largely ignored this evidence. Accordingly, the Court finds that the Association's/NEBA's denial of STD benefits as of September 25, 2002, was arbitrary and capricious.

Therefore: (1) that aspect of the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 22] which seeks a judgment on the administrative record affirming the denial of Newman-Waters' claim for STD benefits as of September 25, 2002 will be **DENIED** and (2) Newman-Waters' for a judgment on the administrative record [Doc. No. 22] will be **GRANTED**.

**IV.** **Newman-Waters' claim for Long-Term Disability benefits**

In her motion for a judgment on the administrative record, [Doc. No. 23], Newman-Waters argues that her claim for long-term disability ("LTD") benefits should be remanded because the Association failed to provide due process to her. *Id.* at pp. 23-25. Along with her motion for a judgment on the administrative record [Doc. No. 23], Newman-Waters filed her affidavit [Doc. No. 24], which is dated February 21, 2005. Newman-Waters' affidavit states in pertinent part:

> **2.** At some time between January 22, 2003 and February 2, 2003, I spoke with a Blue Cross Blue Shield of Tennessee (BCBST) employee named Karen Harris regarding my disability benefits. Harris worked in Human Resources and was a "Benefits Administrator" for BCBST's disability programs

> **3.** During the above conversation, I requested that Harris send me the appropriate Long Term Disability forms for completion.

> **4.** At the time that I requested the forms, my disability prohibited me from driving to pick up the forms. It was my understanding that my employer, BCBST, was supposed to send me the forms upon my request.

> **5.** I made an audio tape of the conversation with Ms. Harris. The relevant portion of the audio tape is attached hereto. Any assertion that I did not request long term benefits is patently false. (Exhibit 1)

> **6.** I was never mailed any forms to complete. Had I received the forms, I would have completed them and submitted them for consideration.

[Doc. No. 24, pp. 1-2](internal citations omitted).

In her motion for a judgment on the administrative record, Newman-Waters admits that " . . . the administrative record contains no evidence that [she] applied for long term benefits or that the Association ever considered [her] for the receipt of long term disability benefits." [Doc. No. 23, p. 23]. Newman-Waters further admits "that ERISA's scheme requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Id.* However, Newman-Waters argues that the Association should not be permitted to rely on the exhaustion requirement in this situation

-28-

because the Association's failure to respond to her request for LTD claim forms frustrated her efforts to apply for LTD benefits. *Id.*

In its motion to affirm the administrator's decision and for a summary judgment, the Association seeks a summary judgment on Newman-Waters' claim for LTD benefits. [Doc. No. 22, pp. 19-21]. The Association seeks a summary judgment on Newman-Waters' claim for LTD benefits on the grounds that: (1) she failed to exhaust the administrative remedies available to her under the LTD program; (2) her claim for LTD benefits is time barred; and (3) even if Newman-Waters had applied for LTD benefits, her claim for LTD benefits would have been denied for the same reasons that her claim for STD benefits was denied. *Id.*

More specifically, the Association asserts that Newman-Waters has failed to exhaust her potential remedies under the LTD plan because she did not even apply for benefits under the LTD plan. *Id.* at p. 19. Further, according to the Association, the LTD plan documents place a one-year deadline for applications for LTD benefits. *Id.* Thus, the Association asserts that as Newman-Waters' last day of work at BCBST was July 17, 2002, the last day she could have timely filed for LTD benefits was July 17, 2003. *Id.* Finally, the Association contends that as the standard for the receipt of disability benefits under the STD and LTD plans are similar, Newman-Waters' claim for benefits under the LTD plan would have been denied for the claim reasons that her claim for STD benefits were denied. *Id.* at p. 20.

## A. <u>Standard of Review</u>

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d

900, 907 (6th Cir. 2001). The Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex Corp.*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

### B. <u>Analysis</u>

Attached to the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 22] is the Declaration of Barbara J. Grant, RN, which is dated February 14, 2005. [Doc. No. 22-2]. Ms. Grant has served as the Director of the Disability Program for NEBA since mid-1998. [Doc. No. 22-2, ¶ 1]. In her declaration, Ms. Grant further states that "[t]he Association, through NEBA, administers both the short term and long term disability programs for BCBST." *Id.* at ¶ 4.

According to Ms. Grant, the non-contributory National Long Term Disability Program ("LTD Program") is a long term disability program which is administered by the Association for employees of BCBST, including Newman-Waters, as well as the eligible employees of other participating employers. *Id.* at ¶ 8. The LTD Program documents consist of:

> the National Long Term Disability Trust Agreement between [the Association] and the Northern Trust Company, the Non-Contributory National Long Term Disability Program, and the National Long Term Disability Program Association Agreement Blue Cross and Blue Shield Association and Participating Plan, and the amendments thereto.

-30-

*Id.* at ¶ 7.

The Summary Program Description for the LTD Program appears in the administrative record.

The Summary Program Description defines Disability in pertinent part as:

> You are considered to be "disabled" under the LTD Program if medical evidence satisfactory to the Administrator indicates you are wholly prevented by reason of mental or physical disability from performing your regular occupation or any comparable occupation . . .

A.R. 268. The Summary Program Description requires Proof of Disability as follows:

> The Program Administrator will review the medical evidence you submit to determine whether you qualify for disability benefits. The medical evidence may include the physician's written statement regarding your diagnosis symptoms and treatment program. In addition to a doctor's statement or conclusion that you "can't work," the Program Administrator must have medical evidence of the kind that shows why you can't work . . . .

*Id.*

In addition, the Summary Plan Description for the LTD Program states:

> **Applying for Benefits**
>
> After you are unable to work for three months and you expect your disability to continue, ***contact your employer to obtain claim forms for you or your physician to complete***. For your claim to be processed quickly, it is important that these forms are filled out correctly and completely and are signed by you and your physician.
>
> Return these claim application forms to your employer promptly so they will be sent to the Administrator within three months after you stopped working. (Claim forms filed a few months late are accepted, but may delay receipt of benefits). ***You have up to one full year after your injury or illness began to submit your claim for benefits. If you file after the year is up, your claim can be accepted <u>only</u> if you demonstrate to the Program Administrator that you were not reasonably able to file for benefits within the one-year period*** . . . .

A.R. 279 (emphasis added).

Finally, the Summary Plan Description for the LTD Program lists the National Employee

Benefits Committee ("the Committee") of the Association as the Program Administrator. A.R. 281.

The Summary Plan Description further states that the Committee has delegated authority for the day-to-day operation of the LTD Program to NEBA. *Id.* The Summary Plan Description also states that:

> The Committee and [NEBA] interpret the program documents, ***prescribe procedures for applying for benefits***, adjudicate claims, distribute program information, and ***adopt whatever rules and procedures are necessary*** for the programs smooth operation.

*Id.*

The National Long Term Disability Program Association Agreement Blue Cross and Blue Shield Association and Participating Plan also appears in the record. It states in pertinent part that:

> The Committee shall have complete control of the administration of the Program, with all powers necessary or convenient to enable it properly to carry out its duties in that respect. Without limiting the foregoing, the Committee has the power to construe the Program and to determine all questions that may arise thereunder. The Committee determines all questions relating to the eligibility of the employees of the Plan and the amount of benefits under the Program to which a Participating Employee is entitled . . . The decision of the Committee upon all matters within the scope of its authority shall be final except as otherwise provided by law.

A.R. 248.

Lastly, the LTD Program documents appear in the record. The LTD Program documents state that:

> A Participant shall be entitled to benefits under this Program if he is found, on the basis of medical evidence satisfactory to the Committee, to be Disabled . . .
>
> A Participant shall not be eligible for benefits under the Program if the Committee determines that he became Disabled more than one year before the filing of the Participant's initial application for Disability Benefits . . . except that such one-year filing requirement shall not apply if the Participant demonstrates to the satisfaction of the Committee that it was not reasonably possible for the Participant to apply for Disability Benefits within one year . . .

A.R. 221. An Amendment to the LTD Plan documents, dated July 2, 1998, also appears in the record. This amendment states in relevant part that:

> "Disabled" means . . . that a participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred. . . .

A.R. 239.

The Sixth Circuit has held that ERISA's administrative scheme requires a participant to exhaust her administrative remedies prior to the commencement of the suit. *Ravencraft v. UNUM Life Ins. Co. of America*, 212 F.3d 341, 343 (6th Cir. 2000)(citing *Baxter v. C.A. Muer Corp.*, 941 F.2d 451, 453-54 (6th Cir. 1991); *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)). However, a Court can exercise its discretion to excuse non-exhaustion where resorting to the plan's administrative procedure would be futile or the remedy would be inadequate. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998)(citing *Constantino v. TRW Inc.*, 13 F.3d 969 (6th Cir. 1994)).

As noted previously, Newman-Waters has submitted an affidavit in which she states that at some point between January 22, 2003 and February 2, 2003, she spoke with Karen Harris, a BCBST, employee and requested that Harris send her Long Term Disability forms. [Doc. No. 24, ¶ 3, 4]. Newman-Waters states that she was under the impression that BCBST was supposed to send her the LTD application forms and that at the time she requested the forms from Harris her medical condition precluded her from driving to pick up the application forms. *Id.* at ¶, ¶ 4. Newman-Waters also states that she never received the LTD application forms, but that she would have completed the forms had she done so. *Id.* at ¶ 6. Finally, Newman-Waters' affidavit states that she made an audio tape of the conversation with Karen Harris. *Id.* at ¶ 5. Newman-Waters has provided an audio CD which contains portions of the relevant conversation with Karen Harris. [Doc. No. 24, Exhibit 1].

As also previously noted, the Summary Plan Description for the LTD Program directs participants who wish to apply for LTD benefits and have been out of work for three months to, "contact your employer to obtain claim form for you or your physician to complete." A.R. 279.

Federal common law principles of contract interpretation, require that the language/terms in ERISA plans be interpreted "in an ordinary and popular sense as would a person of average intelligence and experience." *Swaback v. American Information Technologies Corp.*, 103 F.3d 535, 540-541 (7th Cir. 1996). Among the federal common law principles of contract interpretation is the "basic contract law that a party who prevents the occurrence of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract." *Id.* at 537.

Interpreting the language in the Summary Plan Description of the LTD Plan in its ordinary and popular sense as would a person of average intelligence and experience, the Summary Plan Description directs BCBST employees to contact their employer and have the application forms for LTD benefits sent to them so that either the employee or the employee's physician could complete the application forms.

Newman-Waters asserts that she did just that; namely, that sometime between January 22, 2003 and February 2, 2003 she spoke with Karen Harris, a BCBST employee and requested that LTD application forms be sent to her.[4] The administrative record clearly buttresses Newman-Waters' assertions in this regard. On January 23, 2003, Karen Harris sent a facsimile ("fax") to Donna Jones at NEBA regarding Newman-Waters claim for STD benefits.[5] The cover page of the Fax states:

---

[4] The record is replete with correspondence from the Association to Newman-Waters telling her that if she had any questions or concerns regarding her claim for STD benefits to "contact Karen Harris Benefits Administrator . . . ." A.R. 3, 47, 135, 155, 176, and 194.

[5] The record identifies Donna Jones, RN as the Manager, Integrated Disability Services at NEBA.

> More information for Christine Waters. My understanding is that her doctors are going to send other/more information. **I think the intent now may be to apply for LTD**.

A.R. 36.

Further, the Court has reviewed the audio CD with the record of the telephone conversation between Newman-Waters and Karen Harris. [Doc. No. 24, Exhibit 1]. The audio CD shows that during their telephone conversation, Karen Harris asked Newman-Waters if she wanted the forms for LTD benefits and, in response, Newman-Waters told Karen Harris to send them out. *Id.* at 14:59.[6]

Thus, clearly by January 23, 2003, BCBST and NEBA, through Karen Harris and Donna Jones – as evidenced by Harris' fax to Donna Jones – were aware of Newman-Waters' intent to file a claim for LTD benefits. More specifically, the Court cannot envision how Karen Harris could have reported Newman-Waters' intent to file a claim for LTD benefits in the cover letter of a fax to Donna Jones, unless Newman-Waters had told her of that intent. Moreover, because the Association's correspondence with Newman-Waters directed her to direct any questions concerning her claim for STD benefits to her Benefits Administrator, Karen Harris, logic dictates that if Newman-Waters were to request LTD application forms from BCBST as directed by the Summary Plan Description of the LTD Program, she would most likely have made that request to Karen Harris.

Although the Association expends considerable effort in its brief before this Court arguing that it is entitled to a summary judgment on Newman-Waters' claims concerning LTD benefits due to her

---

[6] The Audio CD contains approximately 44:00 minutes of recorded conversations between Newman-Waters and various employees of BCBST, including Karen Harris. The relevant portion of the conversation between Karen Harris and Newman-Waters, *i.e.*, the point at which Harris asked Newman-Waters if she wanted LTD claim forms and Newman-Waters told Harris to send them to her – occurs at about 14:59 of the approximately 44:00 minute audio CD. The Court listened to the Audio CD on Windows Media Player 9 which indexes time on an audio CD by minutes and seconds starting with 00:00.

failure to exhaust her administrative remedies by filing LTD application forms, there is not a scintilla of evidence in the record showing that BCBST ever provided the LTD claim forms to Newman-Waters.

Finally, the Association argues that as the standards for disability in the STD Plan and LTD Program are similar, the outcome of the two claims for benefits would likely be the same. [Doc. No. 23, p. 23]. Thus, in this instance, the Association already has much, if not all, of the evidence relating to Newman-Waters' claim for disability due to fibromyalgia before it. Further, as the Association that the standards in the two plans are similar and the outcome likely to be the same, the review/adjudication of Newman-Waters' claim for benefits under the LTD Program is not likely to present an onerous task to NEBA/the Association. Most importantly, the Association/NEBA clearly had notification of Newman-Waters' intent to file a claim for LTD benefits in January 2003, well within the one-year period for her to file a claim.

Accordingly, that aspect of the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 23] which seeks a summary judgment on Newman-Waters' claim for benefits under the LTD Program will be **DENIED**. Further, as the Association/NEBA clearly had notice of Newman-Waters' intent to file a claim for benefits under the LTD Program as of January 2003, Newman-Waters' claim for benefits under the LTD Program will be **REMANDED** to the Association.[7]

_____

[7]     The fact that the Association/NEBA had notice of Newman-Waters' intent to file a claim for LTD benefits and failed to comply with the Summary Plan Description by providing her with claim forms does not automatically entitle her to LTD benefits. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003). Rather, the proper remedy is to remand the case with instructions to the LTD Program to provide her with the claim forms she should have been provided with, allow her to file them, and, if she is found entitled to benefits, benefits would be retroactive to the date on which she should have been provided claim form – January of 2003. *Id.*

Moreover, although the Association has argued that the STD Plan and LTD Program have nearly identical standards for disability and the results of Newman-Waters' claims for benefits would be the same under both plans, the Court wishes to emphasize that its remand of Newman-

-36-

It will be further **ORDERED** that the Association will provide Newman-Waters' with the appropriate forms for LTD benefits to be completed by her or her physician(s) and will proceed to consider/review/adjudicate Newman-Waters' claim for benefits under the LTD Program as if her claim had been filed in January 2003.

## V.     Newman-Waters' negligence claim

In its motion to affirm the administrator's decision and for a summary judgment, [Doc. No. 22] the Association seeks a summary judgment on Newman-Waters' claim of negligence. [Doc. No. 22, p. 20].   In her Amended Complaint, [Doc. No. 17] plaintiff asserts that during the course of the administrative review process of her STD benefits claim, that one of the Association's agents negligently and wrongfully provided inaccurate medical information to one of her medical providers, resulting in the withholding of needed medication. [Doc. No. 17, ¶ 13].

The basis of this claim is documented in the notes the Association/BCBST concerning telephone calls related to Newman-Waters' claim for STD benefits.   The notes for January 8, 2003, state in pertinent part:

> Spoke with nurse practitioner, wanted to know if she could help.   Told her that I did not have the file would have to pull up the information on the computer.  Inadvertently looked down at file in front of me instead of the computer screen, and told the nurse . . . concerns re: the drug seeking behavior on this particular patient.   After talking with the nurse for a few minutes, I realized that I was looking down at the information in the file in front of me instead of the computer screen.  I immediately told the nurse that I had given her the wrong information from another claimants chart.  Told her to delete and forget everything that I had told her, that the only thing . . . wanted to know regarding [Newman-Waters] is the description of impairments and basis for disability.  Nurse said that the patient was coming into the office to see the doctor today and she would put the question into her file so that he could see it . . .
>
> Later, Same Date, T.C. from Dr. Wilcox

---

Waters' claim for LTD benefits does not in any way suggest that she is "automatically" entitled to benefits under the LTD Program.

Said that he was calling because he had been informed by his nurse that we had information that [Newman-Waters] was abusing drugs. Told him that I had explained to the nurse that I had pulled information on the wrong claimant. I had asked her to delete that information as I had made a mistake and given her the wrong information. I was in the process of reviewing another file when she called and just got the two mixed up. I assured him that we were only concerned with the descriptions of [Newman-Waters'] impairment. Said that he had denied her medication based on the information that his nurse gave him. Told him Iagain (sic) apologize for the mistake. I assured him that the information given to the nurse was not intended for his patient and that I had admitted to her during our telephone conversation that I had read from the wrong file and gave her the correct information. I told him that I was sorry for any confusion this may have caused, but again assured him that I did not have any knowledge or concerns regarding drug seeking behavior on [Newman-Waters].

A.R. 30-31.

The Association seeks a summary judgment on Newman-Waters' negligence claim on the ground that it is time barred by the one-year statute of limitations for injuries to the person in Tenn. Code Ann. § 28-3-104(a)(1). More specifically, the Association asserts that Newman-Waters' negligence claim arises out of the mistaken information a Nurse Case Manager gave to Dr. Wilcox's nurse on January 8, 2003, but that since Newman-Waters did not file her original complaint in this action until April 1, 2004, it is time barred under Tenn. Code Ann. § 28-3-104(a)(1). [Doc. No. 22, p. 20].

In this instance, Newman-Waters has filed both a reply to the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 26] and has also filed a reply memorandum to the Association's motion to affirm the administrator's decision. [Doc. No. 29]. Newman-Waters has not responded to that aspect of the Association's motion for a summary judgment which seeks a summary judgment on her negligence claim in either of these two documents. Rule 7.2 of the Local Rules of the United States District Court for the Eastern District of Tennessee provides in pertinent part that "[f]ailure to respond to a motion may be deemed a waiver of any opposition to the relief sought."

However, after reviewing the pleadings and all submissions relevant to the motion for a summary judgment, a court should grant a summary judgment "where the evidence is such that it 'would require a directed verdict for the moving party.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505 (1986)(quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 624 (1944)). Once the moving party has satisfied this standard, the nonmoving party must present significant probative evidence in support of its complaint to defeat the moving party's motion for a summary judgment. *Anderson*, 477 U.S. at 249-50; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994). The nonmoving party does not bear the burden of presenting evidence to defeat the summary judgment motion until after the moving party has satisfied its initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 417 U.S. 317, 323, 106 S. Ct. 2548 (1986); *Johnson v. U.S. Postal Service*, 64 F.3d 233, 236 (6th Cir. 1995); *Pierce*, 40 F.3d at 800.

Thus, the Court will not deem Newman-Waters' failure to respond to that aspect of the Association's motion for a summary judgment [Doc. No. 23] which seeks a summary judgment on her negligence claims as a waiver of opposition to the relief sought. Nevertheless, the Court finds that the Association is entitled to a summary judgment as a matter of law on Newman-Waters' negligence claim because the claim is time barred.

Under Tennessee law, in order to determine whether the purpose of an action is to recover damages which are personal, to property, or on account of a breach of contract, the Court looks to the complaint to ascertain the basis for which damages are sought. *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 729 (Tenn. Ct. App. 1980)(citing *Bland v. Smith*, 277 S.W.2d 377, 379 (Tenn. 1955). Tenn. Code Ann. § 28-3-104 states in pertinent part:

(a)     The following actions shall be commenced within one (1) year after
        the cause of action accrued:

(1)     Actions for libel, for injuries to the person . . .

Tenn. Code Ann. § 28-3-104(a)(1).

In this instance, Newman-Waters' claim that the Associations' agents negligently and
wrongfully provided inaccurate information to Dr. Wilcox's nurse, resulting in Dr. Wilcox declining to
write her a prescription clear is an action for injury to the person under Tennessee law.    An action for
injury to the person is an cause of action which accrues to an individual on grounds other than "some
peculiar status or by virtue of an interest created by contract or property."  *Brown v. Dunstan*, 409
S.W.2d 365, 367 (Tenn. 1966).

Further, under Tennessee law, a claim of action accrues when a plaintiff discovers her injury
or through the exercise of reasonable care and diligence should have discovered her injury.  *Mackey v.
Judy's Foods, Inc.*, 867 F.2d 325 (6th Cir. 1989).  In this case, Newman-Waters should have discovered
her injury on January 8, 2003, the date of the misstatement to Dr. Wilcox's nurse and the same date Dr.
Wilcox refused write her a prescription.    At any rate, it is clear that Newman-Waters actually knew of
the misstatement no later than January 15, 2003.   The Association's message log/diary of its contact
with Newman-Waters contains the following entry:

> 1/15/03 REC'D VOICE MAIL FROM [Newman-Waters]
>
> Message said that she had been informed by her doctors office that I had made a
> mistake and told them that she had a drug problem.  She did not receive anything in
> writing from me saying that a mistake had been made and she is concerned as to how
> that may affect her.  Said that it had already affected her in that her doctor had refused
> to give her pain medication . . . .

A.R. 31.

-40-

Thus, because Newman-Waters filed her complaint in April 2004, more than one (1) year after the alleged misstatement by the Association's employee which resulted in Dr. Wilcox refusing to give her additional pain medication, Newman-Waters' negligence claim is time barred by the one-year statute of limitations in Tenn. Code Ann. § § 28-3-104(a)(1).

Accordingly, that aspect of the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 23] which seeks a summary judgment on Newman-Waters' negligence claim will be **GRANTED**.

**VI.**     **The Association's motion to strike** [Doc. No. 31]

The Association moves to strike Newman-Waters' affidavit and the accompanying audio CDs pursuant to Fed. R. Civ. P. 37(c)(1) on the ground that Newman-Waters did not serve her initial disclosures until March 3, 2005, after the filing of both parties' dispositive motions. The Association claim that as a result, it did not become aware of Newman-Waters' claim that she asked for and was not provided with LTD benefit application materials until after it had filed its own dispositive motion. The Association claims that it was prejudiced because it was denied the opportunity to take the depositions of Newman-Waters and/or Karen Harris, the BCBST employee from which Newman-Waters alleges she requested the LTD Program claim forms. [Doc. No. 31].

Newman-Waters asserts that he affidavit and the accompanying audio CDs were attached to her motion for a judgment on the administrative record which was filed on February 22, 2005. [Doc. No. 35]. Moreover, Newman-Waters claims that her affidavit with the accompanying audio evidence was attached to her motion for a judgment on the administrative record as a rebuttal to that aspect of the Association's motion for a summary judgment which seeks a summary judgment on Newman-Waters' claims for LTD benefits on the ground that she failed to exhaust her administrative remedies – *i.e.*, that she failed to take any action to secure benefits under the LTD Program. *Id.*

-41-

Fed. R. Civ. P. 37(c)(1) provides that a party that, without substantial justification, fails to disclose information in accordance with Fed. R. Civ. P. 26, is not "unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." The determination of whether a failure to comply with Rule 26 is harmless is based on four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose. *Texas A & M Research Foundation v. Magna Transp. Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).[8]

In this instance, Newman-Waters' affidavit is important; however, it is not the sole basis for her argument that she requested the LTD claim forms. This is also shown, or strongly suggested by, the fax from Karen Harris to Donna Jones which appears in the administrative record. A.R. 36. Further, the Association's arguments in its reply to defendant's response suggest that the prejudice to the Association is not that great. The Association suggest that "at a minimum [it] has been put to the trouble and expense of reviewing the untimely disclosed evidence, and responding to it." [Doc. No. 45].

Further, Newman-Waters' explanation for its failure to disclose also weighs in favor of the non-exclusion of the affidavit and accompanying audio CD. In her response to the Association's motion to strike, Newman-Waters points out that she offered the affidavit, and accompanying audio CD, only in response to the Association's motion for a summary judgment pursuant to Fed. R. Civ. P. 56 on her claim for benefits under the LTD Program. The Association sought a Rule 56 summary judgment on the ground that Newman-Waters had failed to file an application for LTD benefits within the one-year period – as evidenced by the fact that no application for LTD benefits appeared in the administrative record.

---

[8]   The record shows that Newman-Waters did not file her initial disclosures under Rule 26 with the Association until March 3, 2005. [Doc. No. 34, Exhibit 1].

It is well established that once the party moving for a Rule 56 summary judgment has met its burden, the non-moving party cannot rest on its pleadings to avoid a summary judgment, but must go beyond the pleadings and by some evidence – such as affidavits – designate specific facts which would preclude the entry of summary judgment for the moving party. See *Celotrex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). That is precisely what Newman-Waters did here. She presented evidence, somewhat corroborated by evidence in the administrative record, showing that the Association was not entitled to a summary judgment on its claim that she failed to exhaust her administrative remedies with respect to LTD benefits.

Further, the cases relied on by the Association in support of its motion to strike are distinguishable in this instance. In both *Bowe v. Consolidated Rail Corp.*, No. 99-4091, 230 F.3d 1357 (6th Cir. Sept. 19, 2000)(unpub.) and *Vance by and Through Hammons v. United States*, No. 98-5488, 182 F.3d 920 (6th Cir. June 25, 1999)(unpub.), the courts had excluded expert witness reports which had not been properly disclosed under Fed. R. Civ. P. 26. In this instance, Newman-Waters is not an expert witness, she is the sole named plaintiff.

Lastly, although the Association claims that it was prejudiced by its inability to respond to Newman-Waters' affidavit, the Court notes that Newman-Waters' affidavit, and the accompanying audio CDS, were filed on February 23, 2005. [Doc. No. 24]. Since that time, the Association filed, on March 14, 2005, its response to Newman-Waters' motion for a judgment on the administrative record [Doc. No. 27] and, the Association was also granted leave to file a surreply [Doc. No. 33]. The Association filed its surreply on April 20, 2005, [Doc. No. 34], nearly two months after Newman-Waters filed her affidavit. Thus, the Association had at least two opportunities to respond to Newman-Waters' affidavit with additional evidence, but has not done so.

-43-

Accordingly, the Association's motion to strike Newman-Waters' affidavit and the two (2) accompanying audio CDs [Doc. No. 31] will be **DENIED**.

**VII.**    <u>Conclusion</u>

For the reasons stated in detail, *infra*:

(1)    That aspect of the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 22] which seeks a judgment on the administrative record affirming the denial of Newman-Waters' claim for STD benefits as of September 25, 2002 will be **DENIED**;

(2)    Newman-Waters' for a judgment on the administrative record [Doc. No. 22] will be **GRANTED**;

(3)    That aspect of the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 23] which seeks a summary judgment on Newman-Waters' claim for benefits under the LTD Program will be **DENIED**.

(4)    Newman-Waters' claim for benefits under the LTD Program will be **REMANDED** to the Association and the Association will be further **ORDERED** to provide Newman-Waters' with the appropriate forms for LTD benefits to be completed by her or her physician(s) and will proceed to consider/review/adjudicate Newman-Waters' claim for benefits under the LTD Program as if her claim had been filed in January of 2003;

(5)    That aspect of the Association's motion to affirm the administrator's decision and for a summary judgment [Doc. No. 23] which seeks a summary judgment on Newman-Waters' claim of negligence will be **GRANTED**; and,

(6)    The Association's motion to strike Newman-Waters' affidavit and the two (2) accompanying audio CDs [Doc. No. 31] will be **DENIED**.

A separate order will enter.

*/s/ R. Allan Edgar*
R. ALLAN EDGAR
CHIEF UNITED STATES DISTRICT JUDGE
